Co-Defendant and Co-Appellant. In our brief, we raised three separate issues. I have submitted 28 J letters, I think two 28 J letters on the cross-examination issue, and so I would like to concentrate on that issue today. As the Court is aware, during cross-examination of two Chief Government Witnesses, the two Co-Operating Witnesses, Connie Riggs and Mr. Lemire, we attempted to elicit through cross-examination that they were looking at substantial minimum mandatory sentences. We were interrupted in our cross-examination, and the District Court precluded us from eliciting that testimony. Specifically, Mr. Lemire was looking at a sentence of life without possibility of parole unless the Government moved to reduce his sentence. Now in determining whether or not a Court has placed improper limits on cross-examination, the Court looks at essentially two factors, and that is whether excluding, whether the evidence that was excluded was relevant, and whether, assuming that it was relevant, whether or not there were other legitimate interests that would mandate or justify its exclusion. In this case, neither one of those factors. Now the jury did know something, did it not, with respect to potential sentence? They really didn't know about the potential sentence, right? Well they knew that these Witnesses were exposed to some sort of criminal penalty, were they not? They knew that, but I think something else that the Court needs to key in on here. Well what I'm trying to find out is, what did they know, and what more did you think they should have been allowed to hear? Put it that way. Okay, well the jury knew that they were cooperating, that they were cooperating pursuant to the agreements, that the Government, if it was satisfied with their testimony, would move to reduce their sentences. And only the Government could do that. And only the Government could do that, except, except I think that that point was somewhat under the admonition of me when I was trying to cross-examine the Witnesses, when the Court said specifically not once but twice, sentencing is up to the Court. And that, that I think muddled the entire issue of whether or not these Witnesses were essentially at the mercy of the Government. And as I stated in my brief, I think also the Court's admonition to me and the jury was in fact a misstatement of the law. Because in fact, unless the Government did move to reduce these individual sentences, sentencing was not up to the Court. Sentencing had been set by Congress. But that was brought out rather clearly in the cross-examination of Pointreau, wasn't it? I, you know, when I tried to do that... There's only one man in this room who can bring your sentence down, and that's the U.S. Attorney. Right, but right about that same time, the Court interjected itself and admonished both myself and the jury that sentencing was solely up to the Court. So I think that that whole issue of whether or not that there would be a reward here if the Government was satisfied became somewhat muddled by the Court's admonition. Well, in a post-Booker world at least, that's a correct statement, isn't it? That it really is up to the Court. Not in this case, because their sentences were set by statute. What they pled to in the plea agreement exposed Mr. Lemire to a sentence of life without possibility of parole. And that doesn't matter whether it was pre-or post-Booker. That was not in his sentence unless the Government had moved to reduce it. Mr. Lemire was looking at a five-year mandate for his sentence. Now, the Court could have gone a little above that, but it could not go below that. And that's what I was trying to point out to the jury. And that, I think, is something that the jury should have known, especially with Mr. Lemire, who was, I think, the most important Government witness, to establish his potential bias, to establish reasons that he might, knowingly or unknowingly, shade his testimony in favor of the Government. And I think that that's also something that, had the jury known, probably would have moved his testimony in a much different light. So, unless there's any other questions, I'll allow Mr. Obey to argue, in case he can't do it without having to sign things. Mr. Obey, before you start speaking, that clock shows 4.31. That's your total time for your side. So, if your co-counsel wants to reserve some rebuttal time, he's going to have to, you're going to have to make allowance for that. Thank you, Your Honor. And could I ask the Deputy to add back 30 seconds, because I, your time. There you go. Thank you, Your Honor. I believe Mr. Ness has a control group that, in this case, the fact that our cross-examination was limited, certainly affected Mr. Labrador as it affected Ms. Larson in this case, Your Honor. The issue is, before the Court, that the Court overreached the discretion that it had, and we feel that, certainly, it did overreach that discretion, Your Honor. Well, to what extent do we have to take into consideration the other evidence of guilt that was introduced besides that evidence by Lemire and Pointreau, in your case, the testimony of Riggs that he purchased from Larson and the police were controlling? Your Honor, there was other testimony concerning Mr. Labrador and his drug involvement. The testimony came in the form of controlled buys from Mr. Labrador. It only amounted to a few grams, nowhere near the 300-plus grams that the jury found in this case. The evidence for the larger weights came specifically from Ms. Pointreau and also Mr. Lemire, Your Honor. They were the prime, they had the big numbers in this case. There was other evidence, though. Counsel, on the issue with respect to the defendants not sitting at counsel table, help us sort that out. My understanding is they were sitting directly behind counsel and they had access during the entire trial. Is that a fair assessment or not? That is correct, Your Honor. If counsel is sitting at this table, as we see from my left here, the defendants were seated directly behind us. There was a marshal on each side of those defendants, Your Honor. All right. How do we get inference of guilt from that? I don't have an understanding of that. Your Honor, I think the fact that there's a marshal sitting on each side of your client certainly impresses the jury that this man or lady needs to be controlled in this case. An innocent person, a person sitting there by themselves without an escort, I think gives a better impression to the jury. If they had been seated at the table with us, certainly there would have been marshals in the area but not seated directly next to that client, Your Honor. So it's really more the presence of the marshals that you're concerned about? If they had just been sitting near you without marshals, would your argument be the same? The marshal presence plus the fact that we were physically separated from our clients, Your Honor. Wasn't that because didn't the judge ask the marshals if that was a good idea? The judge asked the marshals what their preference was, and the marshals said we would like to have the clients sit behind us. What deference do we have to give that? I'm sorry, Your Honor. I couldn't hear you. What deference do we have to give to the marshals' expertise as to security? Chevron deference? I think in this case the marshals had no reason to fear anything would happen from these clients. They at no point had been disruptive, caused any commotion, or behaved other than exceptionally well-behaved people, Your Honor. I think the fact that when we're putting a marshal next to a person shows to the jury that this person cannot be trusted. This person needs supervision. I would like to reserve the remaining time. You may do so, Counsel. Thank you, Your Honor. Good morning. My name is Joe Thagard. I'm an assistant United States attorney from the Great Falls office. Can everyone hear me all right? Yes, very well. All right. Thank you. I prosecuted this matter. I'll address my comments primarily to the issue of the contention that the court improperly limited the defendant's ability to cross-examine Lemire and Poitras. In particular, I would draw the court's attention to Larson's excerpt of the record, page 55, which contains the trial transcript, pages 196 and 197. It is true that the court did not allow Mr. Ness to examine Poitras and Lemire about the mandatory minimum sentences which they faced, but I think that it's an important sequence of events that takes place here because what happened was initially a defense counsel asked Poitras about the mandatory minimum sentence. The court sustained its own objection, essentially, and then the government followed up with another objection. It was after that that defense counsel inquired of her whether or not it was, in fact, the government only which could make the motion to reduce her sentence. And I think that that is important here because I think that that tends to dispel the fact or the contention that there was some muddling of the power of that latter question about the fact that only the government could make the motion for a reduction of sentence. That occurred after the court had made its comments, after it had sustained the objections about the mandatory minimum. And looking at the Schoenberg case, it appears that there are three criteria that should be fulfilled in the cross-examination of a defendant about a plea agreement. And those concern what benefit or detriment will flow to the defendant, and certainly Pardon me, Mr. Taggart. On that very question, what benefit will flow to the cooperating witness on the stand, the magnitude of the benefit cannot be assessed by the jury unless they know what sentences are possible without the intervention of the U.S. attorney. Isn't that correct? Well, I don't know that that's entirely correct, Your Honor. I would note two things. First of all, I think that they're made aware that the critical thing is that a motion can be made by the government and by the government alone. And in looking at the Dardanian case from the Ninth Circuit, it appeared in that case, and I think that it's a factually driven sort of argument that's presented in the Dardanian, but it appears from that case that they do not necessarily have a categorical right to look into what the maximum sentence is that a defendant faces. Counsel, I'd like to ask you about a different issue that has not been discussed yet today, and that has to do with the co-conspirator statements. Would you explain to me, in your view, why the statements were made in furtherance of the conspiracy rather than being simply narrative of past activities? Yes, Your Honor. And I think what was made here in furtherance of this was there were trips to purchase these drugs. And in the course of making these trips, the Labrador and this other individual, Faso Comiodas, made statements essentially that the drugs were coming from LARSAC. And those, I think, were made in furtherance or tended to further the conspiracy to the extent that they were apprising Lemire about the source of those drugs. And that seems to be of significance. Is there a fair inference that that's an ongoing source, or is it merely in context of past description? I think it's a fair inference that there's an ongoing source, Your Honor. There were multiple trips which were made in this case. And I think if it were just an isolated incident where Lemire had been told, you know, with respect to one purchase that these drugs were coming from LARSAC, that that would really be more of a past description. But I think in this instance, it really does show that there's an ongoing course of conduct here, that these people are all involved in a conspiracy to distribute drugs, and that Lemire or, excuse me, Labrador were seeing where they were coming from. And, Judge, since you raised that subject, I'd also like to point out that if there were error there, I think that it's harmless because there were additional facts put in evidence in this case, namely the testimony of Riggs, that she purchased drugs from Larson, the testimony from Poitras, that she had been involved with Labrador. They would call a woman named Patty, and they would then go to Larson's home to purchase the drugs. And I think that that certainly, with that powerful sort of evidence, whatever Lemire may have had to say was a best cumulative on that point. Unless the panel has more questions for me, I'll resume my seat. No further questions? Thank you, Counsel. Mr. Ness, you have some reserved time, or your side does. I wanted to, one of the questions that was asked was, to what extent should the Court take into consideration the other evidence that was presented and the testimony of Riggs in determining, I guess, whether or not the cross-examination issue would be saved through a harmless error analysis. Connie Riggs was never, ever connected up to the alleged conspiracy. Connie Riggs was someone who made one controlled buy, attempted to make another controlled buy that was unsuccessful from Ms. Larson. There was never any evidence that Ms. Riggs had any connection whatsoever to Lemire and to Poitras. And, in fact, it was our position all the way through this that the Riggs testimony actually was, could be viewed favorably towards the defense. Because what it established was, is that Ms. Larson, although she acted as a middle person and helped Ms. Riggs get drugs, she, after she got the first amount of drugs, which was personal use, she essentially begged Ms. Riggs to give her some. And, eventually, she was satisfied by getting $10 for her drug. The second time, she didn't even know where to get drugs. So the only evidence here really connecting Ms. Larson to this conspiracy was the testimony of Poitras and Lemire. Thank you, Counsel. The case just argued will be submitted for decision. We will now vote on the argument of the United States v. Leo Orsici.
judges: O'scannlain, Graber, Bea